UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| PINNACLE TREATMENT CENTERS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 2:20-CV-336-PPS-JPK |
| CITY OF CROWN POINT, INDIANA, | ) ) ) | |
| Defendant. | ) ) | |
| | ) ) | CONSOLIDATED WITH: |
| CITY OF CROWN POINT, INDIANA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 2:20-CV-359-PPS-JPK |
| CAPGROW HOLDINGS JV SUB V LLC, PINNACLE TREATMENT CENTERS, INC., and PINNACLE TREATMENT CENTERS IN-1, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## OPINION AND ORDER

Pinnacle Treatment Centers, Inc. operates a group home in a residential

neighborhood in Crown Point for recovering substance abusers. In May 2020, Pinnacle

received a citation for violation of a local zoning ordinance prohibiting multi-family

residences in the residential district where the home is located. Pinnacle sought a

variance requesting that the City not enforce the ordinance so long as residents at the

property qualified as disabled, as defined by the Fair Housing Act, and that the City not

enforce the ordinance so long as residents were undergoing substance-abuse treatment. Following a public hearing, the City denied Pinnacle's request for a zoning variance, prompting this lawsuit.

Pinnacle claims the City's actions constitute a violation of the Fair Housing Act, either in the form of intentional discrimination or the denial of a reasonable accommodation. [DE 34.] The City filed a lawsuit of its own, asserting that Pinnacle and the company that owns the property, CapGrow Holdings JV Sub V LLC, are in violation of the zoning ordinance and seeking injunctive and declaratory relief. [DE 33. *See generally* Cause No. 2:20-CV-359-PPS-JPK.] In light of the common questions of law and fact raised in the two cases, I consolidated the matters for trial while withholding judgment on a formal alignment of the parties until trial. [DE 71.]

Each side now seek summary judgment. [DE 80; DE 83]. In summary, both motions will be denied because there are genuine disputes of material fact as to whether the City's enforcement of the ordinance and refusal to grant a reasonable accommodation in the form of a zoning variance were the result of animus against drug addicts, as opposed to a straightforward application of zoning law.

**Facts**

CapGrow purchased a house in Crown Point, Indiana and began leasing it to Pinnacle shortly thereafter. [DE 93 at 2.] Pinnacle runs a network of treatment centers to help those suffering from substance abuse disorder, including the Crown Point group home. [DE 100 at 1.] Pinnacle's patients have lived in the home since May 2020. *Id.* at 4.

The services provided at the group home provide a "warm, caring, and safe home environment for residents who have furnished inpatient treatment and are transitioning to independent living." *Id.* at 2. The patients who live there do not receive medical treatment or similar in-home services; rather, they receive treatment at a separate Pinnacle treatment facility approximately fifteen minutes down the road in Merrillville. [DE 100 at 5; *see* DE 80-1 at 70.] Residents are taken by van to a Pinnacle treatment facility during the day and return to the group home in the evening; typically nobody is at the house from 9:15 a.m. until 4:30 p.m. [DE 100 at 12–13.] A staff member is present onsite any time the residents are in the home, including overnight. [DE 95 at 13; DE 80-1 at 87.]

Under the City's zoning code, the property is zoned "R-1," a designation "limited to dwellings and public or semi-public uses which are normally associated with residential neighborhoods" and "which would not detract from the residential character of the neighborhood." [DE 93 at 4.] There are two other residential-zoned districts, "R-2" and "R-3," which vary in the number of families permitted per dwelling and lot and yard requirements. *Id.* Section 150.18 of the zoning code lays out "permitted uses" for each district. It provides that "[u]ses not specifically listed or defined to be included in the categories under [§§] 150.10 through 150.23 shall not be permitted." *Id.* at 5. In the R-1 district, the only "permitted uses" are single family-dwellings, public and parochial schools, public parks and playgrounds, churches, and essential services. *Id.* at 5–6. The parties agree that the Waterside Crossing subdivision, where the group

home is located, is "a quiet, friendly and safe neighborhood." [DE 95 at 14; *see* DE 83-1 at 6, 28 (noting that one of Pinnacle's "requirements" for the location of the group home is that it would be in a "quiet, friendly, and safe neighborhood, like any of us would be looking for").]

The code further defines "family" to mean "one or more persons occupying a single dwelling unit, provided that unless all members are related by blood or marriage, no family contains *more than five persons*." [DE 93 at 6 (emphasis added).] Section 150.19, in turn, provides that one may seek "[a]n application for special use" through the Advisory Board of Zoning Appeals," to the extent a use is not permitted in keeping with § 150.18. *Id.* at 5. Finally, § 150.99 makes it unlawful to use any structure in violation of the code or any regulation subsequently enacted by the Board of Zoning Appeals (BZA), and that any use in violation of the code or BZA regulations "shall be deemed to be a common nuisance" and subject to a daily fine of $10 to $300. *Id.* at 6–7.

Pinnacle is a for-profit entity. Its financial "break-even" point for profitability with respect to the group home is approximately 3.3 residents, meaning that it turns a profit if four or more residents are living there. [*See* DE 103 at 1–2.] The parties agree that, at any given time, up to eight people reside in the group home. [DE 93 at 7.] Infrequently, nine people may reside at the home because a new resident entered the facility the evening prior to the departure of another resident. [DE 100 at 4.] The headcount fluctuates daily or weekly depending on who Pinnacle has scheduled to

transition in from its recovery program and the number of referrals it receives from other service providers. [DE 80-1 at 71.]

Thomas Delegatto, a certified alcohol and drug counselor with a master's degree in addiction studies and counseling, serves as the executive director for the group home. *Id.* at 53–54, 56. At his deposition, Delegatto testified that on average, approximately six to seven individuals reside at the home. He was not familiar with any recovery homes designed for fewer than eight residents. *Id.* at 81. Delegatto was pressed on whether the group home could be "successful" if only five unrelated residents were allowed to live there at the same time. While he could not say "that it wouldn't be successful" with only five residents, he believed that the group benefitted from having six or more residents at the same time. *Id.* at 86 ("[T]he benefit for the larger number is a greater success.").

Delegatto further explained that having a higher number of residents is important to the facility's mission: Pinnacle wanted to operate the home at a location "suitable for eight to ten people," because a higher number of residents helps to provide "community support" necessary for substance abusers to transition out of in-patient treatment. [DE 80-1 at 77–78 (explaining that "part of the step-down to a home is community support that the residents who live in that house provide to each other, so a smaller number doesn't really provide that," whereas eight to ten residents "allows for a little bit more of a family and community setting"); *see id.* at 72–73.] At a more general level, Delegatto explained that patients received therapeutic benefits from staying in the

Crown Point home because "they continue to build a foundation for . . . continuing on focusing with their recovery" by living "in a residential setting with peer support where they're also learning skills" like budgeting, preparing their own food, and cleaning up after themselves, which are not features of in-patient treatment. *Id.* at 113.

Prior to opening the group home in the R-1 district, CapGrow and Pinnacle did not run it by the local zoning authorities. The City points to evidence that nobody at CapGrow or Pinnacle looked into the applicable zoning laws until after the home opened in May 2020. Timothy Stephens, CapGrow's VP of Real Estate and Operations, testified that the company's business development team worked with Pinnacle on the acquisition of the home, and that CapGrow did not "really have much input at all as it pertains to the selection of a property . . . that a client may ask [CapGrow] to acquire." [DE 80-1 at 15, 18.] While CapGrow provided input on "diligence matters," like the "appraised value or the condition of the home," Pinnacle selected the property—it "sourced" a home for CapGrow to acquire "that [Pinnacle] believed [met] their operational needs." *Id.* at 16, 18, 26–28. CapGrow did not provide any analysis of local ordinances in connection with the purchase of the home and did not examine the terms of occupancy to make a determination as to whether or not housing up to eight unrelated individuals was possible. *Id.* at 19, 27. Essentially, all CapGrow was concerned with was "confirmation that the property is zoned for residential use," which was "built into a development agreement and lease" with Pinnacle. *Id.* at 29–30.

On May 26, 2020, the City issued a citation to Pinnacle for being in violation of § 150.19 of the zoning code because more than five unrelated individuals resided at the group home. [DE 93 at 4.] In August 2020, prior to Pinnacle's application for a zoning variance, a neighborhood meeting took place. Various City officials, including former mayor David Uran, attended the meeting. [DE 100 at 18; DE 83-2 at 6, 9–10; DE 83-5 at 15–18.] Uran stated that while he would not characterize the crowd as "angry," at various points "people were trying to talk over each other," which "may lead to have somebody talk louder than others." [DE 83-2 at 10.] Anthony Schlueter, who worked for the City as a planner and chief of staff, testified that "some of the neighbors were pretty angry, pretty vocal." [DE 83-5 at 17.] He could not recall any specific statements about Pinnacle or CapGrow, but noted that "it just felt like what [the neighbors] were saying was they just wanted to know why the City allowed that to happen." *Id.*

A September 2, 2020 article in the Times of Northwest Indiana reported on the citation and the neighborhood meeting. The article notes that the proximity of the group home to "otherwise single-family residences" was "stirring a controversy among Waterside Crossing residents," and that upwards of "100 residents from the subdivision attended an Aug. 18 meeting at a park in Waterside to discuss the matter with city officials." [DE 34 at 24–33; *see* DE 56 at 9, ¶ 48; DE 100 at 19.] The article goes on to report that several City officials, including Uran and Schlueter, fielded questions from the residents about the group home. [DE 34 at 28–29.] The article quotes a statement from Dan Bajda, a former police office in Lake County who is an acquaintance of the

mayor and appears to have attended the meeting [*see* DE 83-2 at 9–10], that Bajda was "not against recovery or anything like that, but there's a place for it. And it's not in a single-family subdivision." [DE 34 at 31.] Another member of the community, Savannah Moore, stated that discussion about the group home in the subdivision's Facebook group had "a lot of hateful language towards the people in recovery and making assumptions about them." *Id.* at 32. She further stated that it seemed the comments were "stirring up the angry mob against a house and posting pictures of [residents] and all that kind of stuff." *Id.*

Crown Point does not dispute that these reported statements are accurate or that Schlueter characterized the neighbors who attended the meeting as "pretty angry, pretty vocal" in opposition to the group home. Pinnacle attempts to stretch the evidence further, asserting that at the August 2020 meeting, neighbors "repeatedly disparaged the disabled individuals in the Home." [DE 100 at 18.] That may be a fair characterization of what took place, but Pinnacle's cited evidence does not support such a broad conclusion. What is clear is that prior to Pinnacle's request for a variance, many residents came out to voice their concern with the group home being located in their subdivision. As discussed below, that concern was magnified significantly after Pinnacle sought a variance on August 28, 2020. [*See* DE 100 at 20.]

The proposed variance requested the City not to "(1) enforce Section 150.19 or any City code provision that requires residents at the Property to be members of the same family so long as individuals meeting the definition of 'disabled' under the federal

Fair Housing Amendments Act ('FHAA') reside at the Property; and (2) enforce the City's zoning code or other ordinances to prevent residents undergoing treatment for substance abuse or otherwise 'disabled' under the FHAA from living at the Property." *Id.* A public meeting took place the next spring, on April 26, 2021. *Id.* Pinnacle has submitted a digital recording of the meeting, which ran over the better part of two hours, which it downloaded from the City's Facebook page. [*See* DE 83-10, Exh. A (4/26/21 meeting recording); DE 84 (notice of manual filing).[1]]

Uran testified that he did not see any difference between the tenor of the neighborhood meeting and the hearing on Pinnacle's request for a variance. [DE 83-2 at 13.] For his part, Schlueter recalled that members of the public made statements "similar to" those at the neighborhood meeting, where he acknowledged neighbors "were pretty angry, pretty vocal." [DE 83-5 at 17–18.] The parties dispute various details about what took place at the meeting, but the recording makes clear that many residents expressed their anger (and in some cases outright prejudice) toward the recovering substance abusers living in the neighborhood. Even before members of the public could voice their concerns, the hearing was a tense affair. As Pinnacle presented its position to the BZA, various members of the public loudly interrupted its representatives, asserting that the number of residents in the home "wildly" exceeded eight individuals. [DE 83-10, Exh. A at 40:45.]

---

[1] The hearing recordings have been tendered to the Court as files contained on a USB drive [DE 84], and I will cite excerpts from the recordings by referencing the exhibits to Terry Byard's declaration, docketed separately at DE 83-10.

Many of the objections to the group home have a distinct "not-in-my-backyard" feel to them. For example, a resident stated that the group home was a "disgrace" to the neighborhood, expressed concern that the residents were "on drugs," and did not think his child was safe crossing the street because he feared the recovering substance abusers living in the home could be child predators. [DE 83-10, Exh. A at 1:24–1:26.] He continued that Pinnacle should find somewhere else to put a group recovery facility, like an industrial area far removed from the comfy confines of a subdivision, so its residents "can't just go straight next door . . . where it's just our wives and children for some guy that's flipped off his handle," and asserted that "every female on the block was scared to go by [the group home]." *Id.* at 1:26:12–1:27:05.

Another accused Pinnacle of "manipulating" the Fair Housing Act's protections against discrimination in housing on the basis of disability and called into question whether residents "actually have a disease." *See id.* at 1:11-14. One neighbor disparaged the residents as "derelicts" that live in a "hotel" with a "revolving door," *id.* at 1:23:57-1:24:30, while another voiced concern that residents would go "berserk" and harm senior citizens like herself, *id.* at 1:27:50–1:28:15. Other comments conveyed concern that the presence of recovering substance abusers in the neighborhood made the neighbors feel like prisoners in a community they work hard to maintain. *Id.* at 1:22–1:23, 1:26–1:27. A clear theme rings through: while many neighbors stated their support for recovery services and substance abusers in the abstract, their concerns in many cases

betrayed an underlying prejudice toward the folks next door simply based on

suspicions and prejudice over the fact that they are in recovery.

Mayor Uran addressed the public after the close of comments. [DE 83-10, Exh. A

at 1:37:08.] According to Schlueter, this was unusual; Uran did not regularly attend and

did not typically speak up at BZA meetings. [DE 83-5 at 7–8; *see* DE 83-7 at 31.] Uran

told the crowd that whether or not the requested variance was warranted under the

Fair Housing Act, Pinnacle had not been "up front in the public about what they're

doing at that house." He left the hearing with "more questions than answers," and

found that "disappointing." *Id.* at 1:37:55–1:38:32. But he wanted to be "cautious" about

what he said on the record, in light of the pending litigation, and therefore declined to

explicitly state whether or not he supported Pinnacle's petition. *Id.* at 1:38:35–1:38:55.

For his part, John Marshall, one of the BZA members, testified that "based on

what [Uran said] at the BZA meeting, I would say he was against [Pinnacle's request for

a variance]." Marshall and Schlueter testified that it was rare the mayor to take

positions for or against a particular proposal filed with the BZA. [DE 83-5 at 8; DE 83-7

at 32–33.] Prior to the meeting, BZA members had a private meeting with the mayor

and other city officials. [DE 100 at 26; DE 80-1 at 230.] These executive sessions were

rare; there is evidence that the mayor only rarely attended them and he could not recall

another instance in which he had attended one, and he believed he was invited to

participate because the meeting was held in his office. [DE 80-1 at 19, 230, 232; DE 83-2

at 33–34.] Uran testified that he did not "recall the meeting," but further stated that he

did not encourage BZA members to return a recommendation for or against Pinnacle's petition. [DE 83-2 at 32–34.]

The BZA did not vote on the variance during the April 26 meeting and held the issue over for another meeting on May 24, 2021. [DE 100 at 27; *see* DE 83-10, Exh. B (5/24/21 meeting recording).] Initially, Pinnacle's counsel clarified on the record that while the requested accommodation in the formal petition it had filed with the BZA did not include limitations on the number of unrelated persons living in the home (and instead only sought a variance permitting unrelated individuals to live in one home in the R-1 district based on their disabled status), the "practicality" of a four-bedroom house limited occupancy to eight residents. Counsel plainly stated that Pinnacle did not request an accommodation permitting an "unlimited" number of individuals to live in the home, as the City suggests in its brief. [DE 83-10, Exh. B at 29:00–29:40; *see* DE 94 at 4 n.1.] It seems clear that the BZA understood the requested accommodation was for up to eight residents to live in the group home, and that this request was based on the foregoing considerations about a stable, supportive environment that Delegatto discussed at his deposition.

The May 24 hearing was, once again, a tense affair. At one point in the BZA's questioning, an official (it's not clear from the recording who exactly was speaking) pointedly asked Pinnacle's counsel: "Do you care about residential neighborhoods where you go? . . . Maybe you have a legal right, I don't know. That's for somebody, a judge to determine. But, I mean, don't you care? Would you want a home like this next

to you?" [DE 83-10, Exh. B at 31:45–32:03.] Counsel responded that the tone and nature of the question indicated that the official believed that "there is something wrong with disabled people." *Id.* at 32:03–32:12. The official responded that he disagreed with that characterization, but in any case, the neighbors had bought their homes and whether perceptions were fair or not, the perception would be that their home was worth less because it was located nearby a group home. He expressed his view that Pinnacle seemed to "give a rat's behind" about the neighbors and the dangerous perceptions that would be drawn from the presence of a residential facility for recovering substance abusers being located in the subdivision. *Id.* at 32:13–38.

Members of the public addressed the board once again, which was not the typical practice in a special meeting. *See id.* at 33:00–33:55. A neighbor kicked off the public comments by calling the group home a "flophouse" and "no-tell-motel" that did not belong in a residential area, the obvious implication being it was a place where unsavory activities were afoot. *Id.* at 34:30–35:01. The same neighbor attempted to tender photographs he had taken of purported "visitors" at the group home, and expressed that he had been surveilling the property "for his own safety" and concern for "his kids, his wife, [and] his neighbor[s]." *Id.* at 38:50–39:45. While noting that the residents were not in the home for most of each day, he said the presence of the residents made neighbors' lives "hell" and asserted that Pinnacle was trying to "take advantage" or "manipulate" federal laws for profit. *Id.* at 41:00–41:58.

13

Another neighbor who lived across the street referred to the group home as a "devil house." *Id.* at 45:20–25:25. He added that residents were "strung out" and "smoking a carton of cigarettes a day" and that he was "sure [Pinnacle] measured off that park." *Id.* at 46:00–47:15. The suggestion that Pinnacle had "measured off that park" obviously insinuates that there are restrictions on its residents living near places where children are present, as though the fact that they are in recovery means they are registered sex offenders.

The BZA declined to vote on the petition in May, citing uncertainty on the nature of the variance Pinnacle sought, and set the petition for a special meeting on June 1, 2021. [DE 100 at 28.] At that June 1st meeting, the BZA voted unanimously to recommend the City Council deny the variance request. *Id.* Richard Sauerman, a BZA member, testified that he relied upon "information . . . presented at the BZA meetings" in voting to deny the petition. [DE 83-4 at 10–11.] Crown Point, in opposing Pinnacle's motion, has submitted declarations from the BZA members stating that their vote to deny the variance was not based on "any animus, dislike, disapproval, or discriminatory intent toward persons recovering from substance abuse disorder," they "did not rely on any derogatory comments made by any community members in voting for an unfavorable recommendation," Pinnacle failed to adequately explain why the variance was necessary, and that permitting a business to operate in a residential neighborhood would transform the character of the neighborhood "and undermine the purpose of the relevant zoning restriction." [DE 94-1; DE 94-2; DE 94-3; DE 94-5.]

14

The BZA's recommendation went to the City Council for a vote, and the council voted unanimously to deny the variance on June 7, 2021. [DE 100 at 29–30.] Prior to the City Council's vote, another private session was held where City Council members received minutes of the BZA meetings. Mayor Uran was in attendance; when pressed to provide details on his role in the discussion, he did not provide much detail and said he essentially deferred to the City Council. [*Id.* at 29; DE 83-2 at 19–20, 23–26.] It appears residents continue to live in the group home, and one of the BZA members indicated that since making the recommendation to deny the variance, he had not heard any complaints about the home. [DE 100 at 28; DE 83-3 at 6; *see* DE 83-9 at 11 (Pinnacle has not "vacated" the house).]

## Discussion

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The same standard applies where parties file cross-

motions for summary judgment. *Int'l Brotherhood of Electrical Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir.2002). As explained below, the record in this case reflects disputes of material fact concerning the motivations behind the City's enforcement of the ordinance and refusal to grant Pinnacle's requested variance.

In 1968, Congress passed the Fair Housing Act "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. *See also Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018). The law originally prohibited discrimination on the basis of race, color, religion, or national origin. In 1988, Congress passed the Fair Housing Amendments Act, which extends FHA protections to persons with disabilities (although the term used in the statute is "handicap"). *Id.* (citing Pub. L. No. 100-430, 102 Stat. 1619). The FHAA defines "handicap" as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). The parties do not appear to dispute that the residents at the home suffer from substance abuse disorder (Crown Point certainly doesn't argue to the contrary), and thus qualify as handicapped under the Act.

The FHAA makes it illegal "(1) [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter," and "(2) [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

16

services or facilities in connection with such dwelling, because of a handicap of—(A)

that person." 42 U.S.C. § 3604(f)(1)-(2). The circuit has characterized this language as "a

broad mandate to eliminate discrimination against and equalize housing opportunities

for disabled individuals." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d

775, 782 (7th Cir. 2002) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995)).

"Discrimination" includes not only intentional discrimination that makes housing

unavailable, but also "a refusal to make reasonable accommodations in rules, policies,

practices, or services, when such accommodations may be necessary to afford such

person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Pinnacle asserts that the City's conduct violates the Fair Housing Act in two

ways—disparate treatment and the denial of a reasonable accommodation. The City

says both claims are a nonstarter and it's entitled to judgment as a matter of law. I don't

see it that way because there are material fact disputes that preclude summary

judgment on Pinnacle's claim that the City's actions violate the FHA. Put another way,

Pinnacle has proffered sufficient evidence from which a reasonable jury could rule that

the City's actions constitute intentional discrimination or denial of a reasonable

accommodation.

A plaintiff may prove a violation of the FHA by showing either disparate

treatment or a refusal to make a reasonable accommodation. *Valencia*, 883 F.3d at 967.[2]

---

[2] There is another way to show discrimination—where action has a discriminatory impact but there is no evidence of discriminatory intent. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) Pinnacle does not address this theory in its brief and I therefore deem it waived.

It is well established that the Act applies to "zoning ordinances and other laws that would restrict the placement of group homes." *Oconomowoc,* 300 F.3d at 782 (citing H.R. Rep. No. 100–711, at 24 (1988)); *Hemisphere Bldg. Co. v. Village of Richton Park*, 171 F.3d 437, 438 (7th Cir. 1999) (noting cases "hold or assume . . . that the [FHAA] applies to municipalities, and specifically to their zoning decisions"). *See also Larkin v. Michigan Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) (Congress intended for the FHAA to apply to zoning ordinances that restrict the placement of group homes). As noted above, Pinnacle brings both a disparate treatment claim as well as a failure to accommodate claim. I'll take up each theory in turn.

### Disparate Treatment

A disparate treatment claim requires proof of intentional discrimination, which can be shown via direct or circumstantial evidence. *East–Miller v. Lake County Highway Dept.*, 421 F.3d 558, 562–63 (7th Cir. 2005) (holding "that a showing of intentional discrimination is an essential element of a [FHA] claim" and that a FHA claim could be proven under the direct or indirect method of proof); *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 966 (N.D. Ill. 2018); *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F.Supp.2d 987, 997 (N.D. Ill. 2013) (citing *Nikolich v. Vill. of Arlington Heights, Ill.*, 870 F.Supp.2d 556, 562 (N.D. Ill. 2012)). "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent." *Kormoczy v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir. 1995); *Cavalieri-Conway v. L. Butterman & Assocs.*, 992 F. Supp. 995, 1003 (N.D. Ill. 1998)

(characterizing direct evidence as "a 'smoking gun' of discriminatory intent"). *See also*

*Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997). Here, there is no direct evidence

that City officials enforced the ordinance or denied Pinnacle's requested variance based

on animus toward drug addicts.

However, Pinnacle points me to an array of circumstantial evidence which raises

a reasonable inference that the zoning authorities bowed in the face of intense public

pressure animated by unfounded fears about threats posed by having recovering drug

addicts living in the neighborhood. As outlined above, those fears appeared to be

animated by bias against residents of the group home predicated upon their status as

recovering substance abusers. Claims of intentional discrimination are often based on

circumstantial evidence. This is why the circuit has cautioned lower courts to "exercise

extreme caution in granting summary judgment in such a context." *See Bloch v.*

*Frischholz*, 587 F.3d 771, 786 (7th Cir. 2009) (quoting *Gomez v. Chody*, 867 F.2d 395, 402

(7th Cir. 1989)). In *Bloch*, for example, the Seventh Circuit reversed the grant of

summary judgment on plaintiffs' FHA discrimination claims, finding that while the case

was "no slam dunk," there was sufficient circumstantial evidence, coupled with

reasonable inferences drawn in the plaintiffs' favor, to present a genuine triable dispute

on whether the defendant condominium association intentionally discriminated against

Jewish residents by enforcing a "hallway rule" prohibiting residents from affixing

mezuzot outside their condos. *Id.* at 784, 786–87.

While summary judgment is plainly not appropriate in favor of the City, it is likewise not appropriate the other way—*i.e.*, in favor of Pinnacle. Pinnacle falls short of demonstrating the absence of a triable dispute as to whether the City's enforcement of the ordinance or denial of a variance were motivated by discriminatory animus against individuals obtaining treatment for substance abuse disorder. But, granting Pinnacle the reasonable inferences to which it is entitled in opposing the City's cross-motion, there is enough evidence to present the matter to a jury to decide.

As noted above, there is evidence that the forceful public opposition to Pinnacle's petition for a variance weighed on City officials' decisionmaking. The comments at the public hearing reflect more than just a concern over application of the zoning laws—they reflect vitriol toward and, frankly, plain-old ignorance about substance abusers and the therapeutic importance of transitional housing in a supportive environment as patients transition out of in-patient treatment. To recap, members of the public urged the BZA and City Council to reject the variance because residents were "derelicts" who could go "berserk" at a moment's notice, the group home was a "disgrace to [their] neighborhood," residents were "recidivists" doing drugs in the house, and expressed unfounded concerns that residents would assault children or senior citizens in the community. City officials did not disclaim these statements or suggest that they were inappropriate, as one might do to convey disagreement; and there is evidence from which it appears entirely reasonable to infer that these comments formed part of the basis on which BZA members voted to deny Pinnacle's petition. That

20

is coupled with evidence that the BZA had not been alerted about any issues with the

group home prior the hearing or after the BZA recommended the denial of the variance.

The City argues that these statements came from members of the community, so

they cannot form a basis to reasonably infer that officials sought to enforce the

ordinance or deny Pinnacle a variance. Case law reflects that where animus toward a

protected group forms a key factor in community opposition and officials take actions

in response to such opposition, it is reasonable to infer discriminatory intent. In a

similar case, a court in the Northern District of Illinois found "evidence of community

opposition" supported a claim of intentional discrimination under the FHA. *United*

*States v. City of Chicago Heights*, 161 F. Supp. 2d 819, 831, 846 (N.D. Ill. 2001). In denying

the City's motion for summary judgment based on insufficient evidence that its denial

of a special use permit was "driven by discriminatory motives," the court in *Chicago*

*Heights* specifically noted "the substantial community opposition voiced to the City"

and applied the Seventh Circuit's guidance that "due to the difficulty of proving a

subjective state of mind, cases involving motivation and intent are usually not

appropriate for summary judgment." *See id.* at 846 (citing *Lac Du Flambeau Band of Lake*

*Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th

Cir. 1993)).

*Chicago Heights* is not an outlier – several other courts have similarly looked

askance at decisions made in the context of "strong, discriminatory opposition." *Step By*

*Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 131 (N.D.N.Y. 2016) ("[A] decision

made in the context of strong, discriminatory opposition becomes tainted with

discriminatory intent even if the decisionmakers personally have no strong views on

the matter.") (quoting *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37,

49 (2d Cir. 1997)). *See also Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257

F. Supp. 2d 208, 227 (D.D.C. 2003) ("[E]ven where individual members of government

are found not to be biased themselves, plaintiffs may demonstrate a violation of the

[FHA] if they can show that discriminatory governmental actions are taken in response

to a significant community bias."); *Stewart B. McKinney Found., Inc. v. Town Plan &

Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1212 (D. Conn. 1992) (record

reflected that zoning commission, "at the least, bowed to the political pressure exerted

by the residents of Fairfield opposed to the Foundation's plans," and concluding that

the commission's stated reasons for its decision were "pretextual"); *United States v.

Borough of Audubon, N.J.*, 797 F. Supp. 353, 361 (D.N.J. 1991) ("Discriminatory intent may

be established where animus towards a protected group is a significant factor in the

community opposition to which the commissioners are responding.").

Adding to this, Pinnacle points to evidence that prior to the public hearing, the

mayor met with neighborhood residents, where similarly biased statements about the

group home were a hot topic of discussion. The comments were forceful enough to find

their way into the headlines of the local newspaper. The mayor later met with the BZA

in a closed-door executive session—something that had occurred rarely, if ever, during

his tenure as mayor. When asked what discussions took place during that closed-door

22

session, the mayor initially forgot what took place, then asserted that he did not take a position for or against the petition. BZA member John Marshall's memory was to the contrary, relaying that the mayor's view was "based on what he spoke at the BZA meeting," and therefore that "he was against it." What's more, at the second BZA meeting, a City official pointedly questioned Pinnacle in a manner suggesting animus against the residents based on their protected status—commenting that nobody would want to live next door and "perceptions" would drive down property values because the residents were in treatment for drug or alcohol abuse. After the BZA's recommendation made its way to the City Council, the mayor again met privately with its members to discuss the request; when asked what happened in that session, he claimed a faulty memory.

This is not to say that the case is a "slam dunk" for Pinnacle. Far from it. It's entirely plausible that the driving force behind the denial of its petition was concern over allowing a private real estate investment trust to blithely come into a community and buy a home in an under-the-radar way and then use it for what is, in essence, a business purpose—undermining the zoning code along the way. That's essentially what the BZA members tell me in their affidavits. But, in my view, there is enough evidence to reasonably infer that the BZA and City Council denied the variance, at least in part, on the discriminatory views expressed by members of the public. As it stands, the key question animating the discrimination claim—whether those views were imbued in the

City's official decisionmaking—requires me to weigh competing evidence and make credibility determinations, so it will have to be sorted out at trial.

### Reasonable Accommodation

Turning to the reasonable accommodation claim, the Fair Housing Act "requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling." *Oconomowoc*, 300 F.3d at 783 (citing 42 U.S.C. § 3604(f)(3)(B)). Borrowing from a line of ADA authority, the circuit has explained that the test of reasonableness is a burden-shifting framework:

> The [plaintiff] must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs. Even if this prima facie showing is made, the [defendant] has an opportunity to prove that upon more careful consideration the costs are excessive in relation . . . to the benefits of the accommodation[.]

*Id.* at 784 (quoting *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995)). Evaluating whether a requested accommodation is reasonable "is a highly fact-specific inquiry and requires balancing the needs of the parties." *Id.* In the zoning context, a "waiver" or variance "is unreasonable if it is so 'at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Id.* (quoting *Dadian v. Village of Wilmette*, 269 F.3d 831, 838–39 (7th Cir. 2001)).

The second element, whether the requested accommodation is "necessary," requires the plaintiff to show that "the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability."

*Dadian*, 269 F.3d at 838. "In other words, the plaintiffs must show that without the required accommodation they will be denied the equal opportunity to live in a residential neighborhood." *Oconomowoc*, 300 F.3d at 784.

Finally, the circuit has explained that the last element, "equal opportunity," entails "the opportunity to choose to live in a residential neighborhood." *Id.* (collecting cases). The court in *Oconomowoc* stressed the importance of "community-based" living in providing equal opportunity housing to disabled persons: "Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both." *Id.* Thus, when "a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice." *Id.* (citing *Erdman v. City of Fort Atkinson*, 84 F.3d 960, 963 (7th Cir. 1996)). The circuit has further explained that the second and third elements are akin to a showing of causation: a plaintiff must make a showing that "an accommodation is necessary because of a person's disability is the cause for his being denied the service or benefit" secured by the goal of "equal opportunity" in housing. *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748, 755 (7th Cir. 2006) (en banc).

*Oconomowoc* involved a group home's challenge to a city ordinance that prohibited "small foster homes and community living arrangements" within 2,500 feet of each other or "exceed[ing] one percent of the population of an aldermanic district."

25

300 F.3d at 778. The plaintiff in the case (ORP) provided community-based residential facilities for people with traumatic brain injury and developmental disabilities. It was denied an occupancy permit because there were already two other group homes operating within 2,500 feet of their property. *Id.* at 778–79. ORP applied for a waiver of the rule prior to receiving the denial letter, requesting to operate a six-person home with round-the-clock staff, and argued at a public hearing that the variance was necessary a reasonable accommodation, citing the needs of residents and their difficulties in locating resources to provide services to brain-injured individuals. *Id.* at 779. Neighbors attended the hearing, and several expressed concern that the patients "might become violent and threaten the safety of residents of the community." *Id.* at 779–80. An attorney for several of the neighbors also presented evidence challenging ORP's history as a group home operator, providing incident reports involving physical and sexual abuse and police being called to various group homes. *Id.* at 780. Milwaukee's zoning authorities denied the request for a variance, stating that it was a "flagrant violation of the state's distance requirement," expressing concern for residents' safety due to high traffic and lack of sidewalks, and noting that the facility could impose undue costs and burdens on the city "based on the allegations of problems emanating from other ORP facilities." *Id.*

The circuit concluded that under the zoning law, plaintiffs' "range of residential living choices is restricted by their disabilities," because it precluded "new group homes from opening in most of the City of Milwaukee, thus preventing disabled adults who

cannot live without some support from residing in almost all residential neighborhoods within the city." *Id.* at 787. Plaintiffs met their burden to show that their requested variance was reasonable, as it would pose significant benefits to developmentally disabled and brain-injured persons "by allowing them to live together in a family setting in a residential community without imposing undue financial or administrative burdens on the City." 300 F.3d at 785, 787. To the extent there were undue financial and administrative burdens associated with allowing the group home to exist under the zoning laws, the city "failed to put forth evidence regarding the nature or quantity of these burdens." *Id.*; *see id.* at 785–87. While the city asserted that plaintiffs could not demonstrate non-disabled renters, students, rooming home residents, or any other individuals who were similarly situated had been treated differently, the court found that unpersuasive because it "ignores the fact that group living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide, and not similarly essential for the non-disabled." *Id.* at 787.

The foregoing record reflects material disputes of two key facts bearing on whether the City failed to provide a reasonable accommodation by not permitting up to eight unrelated individuals to live in the group home. Initially, the City asserts that there is no dispute that the zoning ordinance is facially neutral (that is, it does not include any restrictions explicitly based on the residents' protected status), and therefore there is no dispute that denying a variance under its five-person restriction does not harm Pinnacle's residents "by reason of their disability." [DE 94 at 6.] That fact

in isolation does not carry the day. If there is evidence that a facially neutral ordinance is being used to evade the FHA's prohibitions on housing discrimination, that is no protection from liability for the City's discriminatory conduct. *New Horizons Rehabilitation, Inc. v. Indiana*, 400 F. Supp. 3d 751, 767 (S.D. Ind. 2019). *See also McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (technically neutral classifications may not be used "as a proxy to evade the prohibition of intentional discrimination"). As outlined above, Pinnacle has presented evidence from which a jury could reasonably conclude that the BZA and Town Council acted to deny an accommodation based on the plainly discriminatory comments presented by members of the community, none of which were questioned or challenged by City officials, and evidence suggesting that the mayor was actively opposed to the variance after hearing similar comments from the community.

The City also asserts that Pinnacle has made no showing that the requested accommodation is necessary based on Delegatto's testimony about the benefits provided to Pinnacle patients in a group home with up to eight unrelated residents. It tells me that Delegatto's testimony is inadmissible because it was not rationally related to his own perception and therefore cannot be considered proper lay witness testimony under Federal Rule of Evidence 701, and that alternatively it contains expert opinions that do not meet the more rigorous standards of Federal Rule of Evidence 702. [DE 94 at 10–11.]

28

Delegatto testified from his personal knowledge about Pinnacle's practices at
different group homes and said he was not familiar with any group homes with fewer
than eight to ten residents. He explained that he was a certified alcohol and drug
counselor with a graduate degree in the field and engaged in continuing education,
while serving as executive director for the home and the treatment center in
Merrillville. His testimony was based on his personal experience working daily with
Pinnacle's residents—his job entails all aspect of tending to residents' care. The
questions he fielded were directed at the practices Pinnacle follows with respect to its
treatment program, including residential housing—not standard practices at group
homes in general. Delegatto's testimony was based on his perception of Pinnacle's
practice of preferring a higher number of residents to facilitate an environment with
ample peer support for its residents (and the relatively intuitive reasons for that
practice). In other words, it is admissible lay witness testimony. *See, e.g.*, *Tutor Time
Learning Centers, LLC v. Larzak, Inc.*, 2007 WL 2025214, at *8 (N.D. Ind. July 6, 2007)
(denying motion to strike lay witness's opinions based on personal knowledge of
customs in child care industry in Lake County based on ownership of child care center,
noting that any inferences in affidavit were based on witness's personal observations in
the industry and not "flights of fancy, speculations, hunches, intuitions, or rumors
about matters remote from [their] experience") (quoting *Visser v. Packer Eng'g Assocs.,
Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). *See also United States v. Parkhurst*, 865
F.3d 509, 514 (7th Cir. 2017) (explaining that lay witness testimony must be rationally

based on the witness's perception, helpful to clearly understanding his testimony, and not based on scientific, technical, or other specialized knowledge reserved for expert opinion testimony).

Delegatto's testimony goes directly to whether, as Pinnacle contends, a variance permitting up to eight residents is necessary because having more than five residents in the home fosters a supportive community environment essential for residents to successfully transition from in-patient treatment. His view on the benefits of such an environment are subject to dispute; in isolation, they certainly cannot be viewed as dispositive, as Pinnacle seems to suggest in moving for summary judgment on the accommodation claim. But as to the City's cross-motion, I must view the evidence in the light most favorable to Pinnacle and draw all reasonable inferences to which it is entitled. It appears entirely reasonable to infer, based on the information Delegatto provided, that the accommodation is reasonable and necessary because a community-based residential facility with up to eight people in residence is "the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both." *See Oconomowoc*, 300 F.3d at 784.

Of course, Pinnacle's longing for an eight person home may be motivated by nothing more than a crass financial incentive. That's what the City tells me—more residents equal more profits. While I find it persuasive that Pinnacle runs a for-profit business and its incentives in this case are not driven exclusively by patient care, those

facts are not overwhelming in light of evidence indicating that having up to eight

residents in the home provides therapeutic benefits to the disabled residents that would

not exist absent the requested accommodation. In the end, a jury will have to decide

who to believe.

I will add that Delegatto's testimony is not the only evidence weighing in

Pinnacle's favor. Despite apparent concern among neighbors about the unruliness of

residents (some concerns so strong they prompted covert surveillance), there is scant

evidence that the group home has presented a burden to the City or that the health,

safety, welfare, or character of the neighborhood has been negatively impacted since the

residents moved in. Indeed, a BZA member testified that he had not received any

complaints about the home since recommending the denial of a variance. *See, e.g.*,

*Groome Res., Ltd., L.L.C. v. Par. of Jefferson*, 52 F. Supp. 2d 721, 723 (E.D. La. 1999), *aff'd*,

234 F.3d 192 (5th Cir. 2000) (noting home seeking zoning variance to permit up to five

disabled residents was denied an accommodation that was "clearly reasonable and

necessary," noting "none of the residents drive, [so] there are few if any automobiles at

the homes," there was no evidence the "patients would cause any problems" or

negatively impact the neighborhood, and if the "home was occupied by a family, there

would be no limit on the number of persons who reside there"). Here, there is no

dispute that any house in Waterside Crossing could house upwards of twelve or more

residents, provided they were all related to one another. While the City forcefully

argues that permitting the variance would change the nature of the neighborhood by

permitting unrelated individuals to live together, and that the whole purpose of the variance is to prevent six or more unrelated individuals to live together, I am unpersuaded that the record presented reflects that granting a variance in this case is "so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Oconomowoc*, 300 F.3d at 784; *Dadian*, 269 F.3d at 838–39.

In sum, the record reflects triable disputes as to whether the variance is reasonable and necessary to provide Pinnacle's residents the opportunity to live in a residential neighborhood in Crown Point.

**ACCORDINGLY:**

For the reasons explained in this Opinion and Order, the parties' cross-motions for summary judgment [DE 80; DE 83] are **DENIED**.

**SO ORDERED.**

ENTERED: March 29, 2024.

 /s/ Philip P. Simon              
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT